

**FILED**
MAY 06 2011

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MARGARET A. BENSON, M.D., | CIV 08-4072 |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER RE: MOTION FOR SUMMARY JUDGMENT |
| SANFORD HEALTH and SANFORD MEDICAL CENTER, | |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendants, Sanford Health and Sanford Medical Center have moved the Court to grant summary judgment in their favor on Plaintiff's claims against them. Doc. 90. Plaintiff, Margaret A. Benson, M.D., has opposed the motion and filed a supplemental response. Doc. 95, 118. Defendants filed a reply to the response and a reply to the supplemental response. Doc. 114, 124. The Court heard argument on the motions on May 2, 2011.

Principles of Summary Judgment

Summary judgment shall be entered if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).In employment discrimination cases, summary judgment should seldom be granted because intent is often the central issue and claims are often based on inference. *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir.2004). However, employment discrimination cases are not immune from summary judgment, and there is no separate summary judgment standard that applies to these cases. *See Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).

## BACKGROUND

Plaintiff, Margaret A. Benson, M.D., (Dr. Benson) graduated from medical school in 1984 and began a residency in family practice at Sioux Falls Family Practice Residency. She became board certified in Family Practice medicine in 1988 and has continued in Family Practice medicine since that time. The Sanford Family Practice Clinic in Beresford had been a satellite clinic of Central Plains Clinic before merging with Sioux Valley Clinic, which has now become Sanford. While under the control of Central Plains Clinic, the Beresford Clinic operated mainly through the presence and work of a mid-level medical practitioner.[1] In 1995, Dr. Benson began oversight of the mid-level practitioner and also saw patients herself once a week at the Beresford Clinic. For financial reasons, Dr. Benson became the only physician that worked at the Beresford Clinic. Dr. Benson had admitting privileges to Sanford Medical Center.

When Central Plains Clinic merged into Sioux Valley Clinic, Dr. Benson continued the once-a-week visit and supervision and also worked for Sioux Valley Clinic at its Acute Care Clinic in Sioux Falls, South Dakota. Dr. Benson's Beresford Clinic duties included oversight and chart review of the mid-level practitioner for ½ business day per week, as well as actually seeing clinic patients at the Beresford Clinic one business day per week, typically on Wednesdays.

In approximately 2005, Sanford established a clinic in Harrisburg. The mid-level practitioner who had been working in Beresford then moved to Harrisburg to staff that clinic. Plaintiff had input into hiring Jan Wright, a Certified Nurse Practitioner, as the new mid-level practitioner at the Beresford Clinic. Dr. Benson was happy with her work at the Beresford Clinic, was liked by her patients and staff, but had not been asked to work more days at the Beresford Clinic.

In May 2006 Dr. Benson was contacted to attend a May 9, 2006 meeting with Tony Tiefenthaler, Vice President of Primary Care, and Darla Landeen, Vice President of Medical Sub-Specialty and Primary Care at Sanford. At the meeting Tiefenthaler, the Vice President then in charge of the Beresford Clinic, asked Dr. Benson about whether it was the money that was keeping her at the Beresford Clinic and offered her the position of supervising physician at a proposed

---

[1] Mid-level practitioners include physician assistants and nurse practitioners.

Minute Clinic in Sioux Falls. The concept of the Minute Clinic was opposed by a number of physicians, including Dr. Benson. Dr. Benson testified in her deposition that after she declined the offer, Tiefenthaler blurted out, "I just need to get a man down there."[2] Dr. Benson testified she was "[b]eyond belief that someone in this day and age could say that to somebody."

After the May conversation with Tiefenthaler, Dr. Benson told Dr. Heinemann, the chief medical officer for Sanford Clinic and Sanford Health Network, about Tiefenthaler wanting a man physician at the Beresford Clinic. Dr. Heinemann said that of course they would want a man to do prostate exams on men. Dr. Heinemann also defended what Dr. Benson perceived as a bribe to become the medical director of the Minute Clinic by characterizing it as another opportunity. Dr. Benson inquired of Beresford Clinic staff members if any requests were made by the patients for a male physician and was told such requests had not been made.

A male physician, Dr. Haigh, began working at the Beresford Clinic in August of 2006. Tiefenthaler testified that Dr. Haigh was right our of residency when he started with Sanford in 2006. When Dr. Haigh showed up to work in Beresford, Dr. Benson was advised that if Dr. Haigh was not a good fit the matter would be reevaluated. Dr. Benson testified that she asked Dr. Haigh about Tiefenthaler's comment about needing a man in Beresford and Dr. Haigh said although he had never heard that comment, Tiefenthaler had told Dr. Haigh, who had a military background, that he needed someone in Beresford "to turn that big ship around."

Dr. Benson testified in her deposition that Dr. Haigh undermined her authority by doing such things as changing charts, medication orders and courses of treatment, criticizing care provided by Dr. Benson, and criticizing the mid-level practitioner that Dr. Benson supervised. Dr. Haigh's criticisms could be heard in the reception area. Dr. Haigh also voiced his desire to get a new building and to change the scheduling. Dr. Benson testified that in October-November it became obvious to her and her mid-level practitioner that Dr. Benson was getting pushed out and that Dr.

---

[2]In his affidavit, Tiefenthaler states, "I do not recall, nor do I believe, that I ever told Dr. Benson that we needed a 'man' in Beresford." Dr. Blue testified in his deposition about asking Tiefenthaler about the comment and that the comment was taken out of context and "I think he was speaking more to the cultural aspect of the addition of a male to that team would be a positive for those patients who would like to seek a male physician." Tiefenthaler denies being talked to about Dr. Benson's claim of gender discrimination.

Haigh was going to be the full-time physician at the Beresford Clinic. In addition, a brochure was printed for the Beresford Clinic that did not list Dr. Benson, but listed Dr. Haigh as one of the clinic's supervising physicians. Before the brochure was in final form, Darla Landeen, the clinic manager, advised that the brochure would be corrected to include Dr. Benson as a supervising physician, but Dr. Benson was not included in the final form of the brochure.

In November of 2006, Dr. Benson and her mid-level practitioner met with Tiefenthaler in his Sioux Falls office to advise that Dr. Haigh was not a good fit for the Beresford Clinic and was not treating the mid-level practitioner appropriately. Dr. Benson also confronted Tiefenthaler about his May 2006 comments regarding needing a man at the Beresford Clinic. According to Dr. Benson, Tiefenthaler became flustered and nervous and said that Dr. Haigh being at the Beresford Clinic was the way things were going to be. The mid-level practitioner testified that Tiefenthaler stated at that meeting that there had been requests for male physicians. The next month, the mid-level practitioner's position was reduced to half-time. The mid-level practitioner was told by Cindi Slack, a Sanford Vice President, that her full-time position at the Beresford Clinic was going to be changed to a part-time position and that Sanford was bringing a physician on full-time to the Beresford Clinic.

Dr. Benson then decided to talk to Dr. Blue, the President of Sanford Clinic, for redress of the negative changes at the Beresford Clinic. Dr. Benson told Dr. Blue of the conversation she had with Tiefenthaler in May of 2006.[3] Dr. Blue said he would get back to Dr. Benson about the matters discussed, but did not contact her. Tiefenthaler later called Dr. Benson in January of 2007 and told her that her mid-level practitioner had accepted a full-time position in Sanford's nephrology department. When Dr. Benson repeatedly asked Tiefenthaler if that is what her mid-level practitioner wanted, Tiefenthaler ignored the question and stated that the mid-level practitioner needed a full-time job and the position in Beresford was no longer full-time. Dr. Benson then asked Tiefenthaler what the plan was for the Beresford Clinic. When Tiefenthaler said Haigh would work there on Tuesdays and Benson would work there on Wednesdays and "we'll just have to try and find some mid-levels to help on the other days," Dr. Benson said she would no longer be coming down

---

[3]Dr. Blue states in his affidavit that Dr. Bender informed him of Tiefenthaler's comment about needing a male presence at the Beresford Clinic. Dr. Blue states that he told her Tiefenthaler misspoke and that his comment was not representative of Sanford's intent.

to the Beresford Clinic on Wednesdays. Although Dr. Benson continued under her contract with regard to the acute care duties, she did not return to the Beresford Clinic position. Dr. Haigh eventually became a full-time physician at the Beresford Clinic in August of 2009.

Dr. Benson brought her action against Sanford, alleging gender or sex discrimination, negligent infliction of emotional distress, and vicarious liability. She seeks compensatory and punitive damages.

## I.
## WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DR. BENSON ON HER CAUSE OF ACTION FOR GENDER OR SEX DISCRIMINATION?

A plaintiff who claims employment discrimination may survive a motion for summary judgment either by proof of "direct evidence" of discrimination, or by creating the requisite inference of unlawful discrimination through the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 991-992 (8th Cir. 2006). "'[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 609 (8th Cir.2006) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004)). Direct evidence in employment discrimination cases must be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process. *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d at 609. Direct evidence is "'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that attitude was more likely than not a motivating factor in the employer's decision.'" *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir.1993)(quoting *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992)).

If a plaintiff presents direct evidence of sex discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989). Evidence of the employer's motives for the action, and whether the presence of mixed motives

defeats the plaintiff's claim, is a trial issue, and not one intended for summary judgment. At the summary judgment stage the issue is simply whether the plaintiff has presented sufficient evidence that unlawful discrimination was a motivating factor in the adverse employment action. *Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir.2004). If a plaintiff presents direct evidence of discrimination, the *prima facie* case stage of the *McDonnell Douglas* test may be avoided because there is no need for the Plaintiff to create an inference of discrimination. *Adams v. Nolan*, 962 F.2d 791, 795n.6 (8th Cir. 1992); *see also, Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 648 (8th Cir. 1987).[4]

It is unlawful to discharge or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of the individual's sex. 42 U.S.C. § 2000e-2 (a)(1). Although a plaintiff cannot state an adverse employment action if she voluntarily resigns, circumstances that rise to a constructive discharge are also considered an adverse employment action because the actions are not viewed as ones that are truly voluntary. *Tusing v. Des Moines Independent Community School Dist.*, --- F.3d ----, 2011 WL 1364477 at *10 (8th Cir. April 12, 2011). Dr. Benson pled and contends that she was constructively discharged. Defendants contend Dr. Benson has not shown constructive discharge. To establish constructive discharge[5] a plaintiff must show (1) a reasonable person in her situation would find the working conditions

---

[4]To survive summary judgment under the burden-shifting approach of *McDonnell Douglas*, a plaintiff must establish a *prima facie* case of employment discrimination. 411 U.S. at 802. If the *prima facie* case is established, the employer may advance a legitimate, nondiscriminatory reason for the employee's discharge. *Id.* The burden of production then returns to the plaintiff to show that the employer's reason is a pretext for the discrimination. *Id.* at 804.

[5]A Title VII claim of sexual harassment creating a hostile work environment and a claim of constructive discharge are distinguishable claims having different elements. While a hostile work environment can form the basis for a constructive discharge allegation, sexual harassment creating a hostile work environment discrimination can exist absent a tangible employment action. *See Winspear v. Community Development, Inc.*, 574 F.3d 604, 607 (8th Cir.2009). A plaintiff claiming sexual harassment creating a hostile work environment must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex. *Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923 (8th Cir.2010). Dr. Benson has not presented a claim of sexual harassment creating a hostile work environment.

intolerable, (2) the employer intended to force her to quit, and (3) the employee must quit. *See Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 534 (8th Cir.2008); *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996). A plaintiff can satisfy the intent requirement by demonstrating that she quit as a reasonably foreseeable consequence of her employer's discriminatory actions. *Hukkanen v. International Union of Operating Eng'rs*, 3 F.3d 281, 285 (8th Cir.1993). To demonstrate that she acted reasonably, "an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d at 494.

In this case Dr. Benson for the purpose of this summary judgment motion has produced evidence that she was asked by Tiefenthaler, one of the Vice Presidents in charge of the Beresford Clinic, to take another position, and was told that Sanford needed a man at the Beresford Clinic. She has also produced evidence that a male physician, who was the only physician offered the position at the Beresford Clinic, came to work at the Beresford Clinic while Dr. Benson was still working there. She has also produced evidence the male physician routinely criticized her work, undermined her authority, and was disrespectful of the mid-level practitioner she supervised at the Beresford Clinic. In addition, a brochure was printed for the Beresford Clinic that did not list Dr. Benson, but did list the male physician Dr. Haigh as one of the clinic's supervising physicians. After waiting and determining that the male physician was not a "good fit" at the clinic, Dr. Benson complained to Tiefenthaler and was told that the situation was not going to change. When Dr. Benson then spoke to Dr. Blue, the President of Sanford Clinic, about the conditions at the Beresford Clinic, he told her he would get back to her about her complaints but never did so.

After Dr. Benson complained of the conditions that led to the alleged constructive discharge, Sanford cut the mid-level practitioner she supervised from full-time to half-time, and ultimately Tiefenthaler called Dr. Benson to advise that her mid-level practitioner had accepted a full-time position in another Sanford department. Dr. Benson asked for but was not advised of any plan to address the replacement of the mid-level practitioner other than Tiefenthaler saying that Dr. Haigh would work on Tuesdays, Dr. Benson would work on Wednesdays, and "I guess we'll just have to try and find some mid-levels to help on the other days." Dr. Benson testified that the loss of her mid-level practitioner would double her work load. When Dr. Benson received the information concerning the transfer of her mid-level practitioner, she determined "they at that point had won."

She left the Beresford position at that point. For purposes of avoiding summary judgment, Dr. Benson has established constructive discharge.

The Court concludes that Dr. Benson has presented direct evidence that unlawful discrimination was a motivating factor in her alleged constructive discharge at the Beresford Clinic. Tiefenthaler was a person involved in the decisionmaking process involving the alleged constructive discharge. Tiefenthaler's claimed statement regarding needing a man at the Beresford Clinic,[6] and the placement and support of the male physician at the Beresford Clinic under the circumstances of this case support a finding by a reasonable fact finder that gender actually motivated the adverse employment action alleged in this case. Although Defendants have presented substantial evidence that contradicts Dr. Benson's evidence regarding Defendants' motives, such evidence creates an issue at trial but does not entitle Defendants to summary judgment on the gender discrimination claim.

## II.
### WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DR. BENSON ON HER CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS?

Defendants maintain that the should the Court should grant summary judgment in their favor on Dr. Benson's claim of negligent infliction of emotional distress. Defendants rely on *Nelson v. WEB Water Development Ass'n, Inc.*, 507 N.W.2d 691, 699 (S.D. 1993), for the proposition that the tort of negligent infliction of emotional distress requires manifestation of physical symptoms and some causal nexus between the distress and the physical injury. Defendants maintain that since Dr. Benson did not seek medical or psychological treatment she lacks the necessary medical opinion to establish the requisite causal connection between her alleged injury and her alleged sleeplessness and

---

[6]The Court rejects Defendants' claim that the claimed remark was too remote in time to the constructive discharge to support a finding of direct evidence of discrimination. The cases cited by Defendants present facts that are distinguishable from those in the case at hand in that either they present claims of retaliation, *see, e.g., Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir. 2001), or stray remarks that were significantly more remote than the claimed remark in the case at hand. *See, e,g,, Frieze v. Boatmen's Bank of Belton,* 950 F.2d 538, 541 (8th Cir.1991) (four year gap between the discriminatory statement, and the job termination).

headaches.

Although Dr. Benson testified that she did not seek additional medical or psychological treatment for the headaches and sleeplessness she maintains she suffered as a result of the events that led up to the alleged constructive discharge and she testified that as a physician she knew the cause of the conditions. She also testified she received counseling from her physician partners and sleep medication from one of these partners. In consideration of the circumstances of the case, Dr. Benson's testimony is sufficient to avoid summary judgment on the issue of Defendants' conduct causing emotional distress. *See, e.g., Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 932 (8th Cir. 2010)(plaintiff's testimony and evidence that pastor with whom plaintiff underwent counseling was also a licensed psychologist and that a Midwest nurse temporarily increased plaintiff's antianxiety medication sufficient to prove emotional damages); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir.1997)(testimony of wife and son sufficient to establish emotional distress).

### III.
### WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DR. BENSON ON HER CAUSE OF ACTION FOR VICARIOUS LIABILITY?

Dr. Benson's third cause of action sets forth a cause of action entitled "Vicarious Liability." Defendants maintain there is no such cause of action and they are entitled to summary judgment on that basis. The cases relied upon by Dr. Benson do not support an independent cause of action that is supported by the facts of this case. *See Kirlin v. Halverson*, 758 N.W.2d 436 (S.D. 2008)(assaults between workmen of different employers can be foreseeable, for purposes of respondeat superior); *Leafgreen v. American Family Mut. Ins. Co.*, 393 N.W.2d 275 (S.D.1986)(insufficient nexus between agent's employment as insurance agent and burglary to impute liability to insurance company for agent's felonious acts). Defendants are entitled to summary judgment on the "Vicarious Liability" cause of action.

## IV.
## WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DR. BENSON ON HER CLAIM FOR PUNITIVE DAMAGES?

In a Title VII action, punitive damages are available if a plaintiff shows that her employer engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights" of the victim of discrimination. 42 U.S.C. § 1981a(b)(1). The Supreme Court has explained that "'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). For an employer to be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." 527 U.S. at 536. The employee need not show that the employer engaged "in conduct with some independent, 'egregious' quality." 527 U.S. at 538. If a plaintiff employee shows that an employee of the company acted with the requisite malice or reckless indifference, the plaintiff must then show that the employee's mental state can be imputed to the employer. 527 U.S. at 539. The malice or reckless indifference of employees serving in a managerial capacity and acting within the scope of their employment may be imputed to the employer. 527 U.S. at 543. An employer may avoid liability for punitive damages, however, if it shows that the employees' actions "are contrary to the employer's good-faith efforts to comply with Title VII." 527 U.S. at 545; *E.E.O.C. v. Siouxland Oral Maxillofacial Surgery Associates, L.L.P.*, 578 F.3d 921, 925 (8th Cir. 2009). However, if an employer discriminates in contravention of its own policies, the existence of those policies does not allow the employer to escape punitive damages. *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004).

Defendants are sophisticated organizations and their management are aware of federal discrimination law. Factual questions remain regarding Defendants' state of mind, distribution of its anti-discrimination policy, and good faith efforts to comply with Title VII. Summary judgment is therefore denied on the punitive damages claim. Accordingly,

> **IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 90) is granted with regard to the "Vicarious Liability" cause of action and denied with regard to all other causes of action and claims.

Dated this 6th day of May, 2011.

BY THE COURT:

/s/ Lawrence L. Piersol
Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
(SEAL)      DEPUTY

11