**FILED**

UNITED STATES DISTRICT COURT

DEC 16 2011

DISTRICT OF SOUTH DAKOTA

CLERK

SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| | * | |
| MARGARET A. BENSON, M.D., | * | CIV 08-4072 |
| | * | |
| Plaintiff, | * | |
| | * | |
| | * | MEMORANDUM OPINION |
| vs. | * | AND ORDER RE: MOTION |
| | * | FOR NEW TRIAL |
| SANFORD HEALTH and | * | |
| SANFORD MEDICAL CENTER, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Margaret A. Benson, M.D., has moved under Fed. R. Civ. P. 59 for this Court to set aside the verdict the jury returned on July 8, 2011, and the judgment entered thereon on July 19, 2011, and to grant a new trial on the grounds that Plaintiff's rights were substantially denied when the jury returned a defense verdict on her Title VII claim and a verdict in the amount of $0 on her negligent infliction of emotional distress claim.

## FACTUAL BACKGROUND

The evidence at trial[1] shows Plaintiff had been employed at Sanford's Beresford Clinic for twelve years before her claimed constructive discharge in January of 2007. Plaintiff had good relationships with staff and patients. Plaintiff testified at trial that at a meeting in May of 2006 with Vice President Tony Tiefenthaler, Tiefenthaler offered her a position supervising a Minute Clinic Sanford was planning on starting. Plaintiff testified that when she told Tiefenthaler she did not want to leave the Beresford Clinic and was not interested in the Minute Clinic supervisory position, Tiefenthaler said a couple of times, "I've got to get a man down there," in reference to the Beresford Clinic.

Plaintiff's Exhibit 46, a March 28, 2006 E-mail from Tiefenthaler to other Sanford

---

[1]Although there is no transcript of the trial, the Court's forty pages of trial notes and the district court's "For the Record" recording system were reviewed in setting forth the facts in this memorandum opinion.

management employees states:

> We are looking at a 9.1.06 transition date. I am meeting with Danielson [Executive Vice President for Sanford] and Blue [President of Sanford] this week and I will talk to them about Benson [Plaintiff]. Darla [Beresford clinic manager] and I think we need to begin working with Benson on a transition in May. Worse case scenario would be that she would leave us high and dry and then we would need to look for coverage from Canton.
>
> It is not that we don't like the service we are getting from Benson; we just feel we can do more for the patients in that area by working with the Canton physicians and having a male physician is an added bonus.

Dr. Blue testified he did not recall the E-mail, and had first seen the E-mail the week before trial. Dr. Blue further testified that he did not specifically recall the meeting referenced in the E-mail.

Plaintiff testified that in July of 2006 she asked Dr. Heinemann, Chief Medical Officer for Sanford, if he knew about the conversation she had with Tiefenthaler about needing a man at the Beresford Clinic, and that Heinemann responded, "Of course men would want a man physician down there to do certain exams." A nurse practioner who was later terminated by Sanford, Sheryl Marckstadt, testified at trial that she was present for this conversation between Plaintiff and Dr. Heinemann, and that Heinemann was angry and stated that patients wanted a male physician in Beresford. Dr. Heinemann testified at trial that he does not recall the conversation occurring but does not dispute that the conversation occurred. Dr. Heinemann testified that if the conversation did occur he should have done some investigation.

Dr. Rosa Lundin also testified that she interviewed in 2004 and wanted a job at Sanford's Canton Clinic. Dr. Lundin testified that she was told by Sanford's recruiter that Sanford was looking for a male for the position. Dr. Lundin testified that after interviewing she was not contacted by Sanford for that position. Sanford's recruiter testified that Dr. Lundin was not offered the position but denied making the comment that Sanford was looking for a male for the Canton position.

In September of 2006, Dr. Haigh, a male physician was brought to the Beresford Clinic. Plaintiff testified that before Dr. Haigh came to the clinic Plaintiff was told that Sanford was going to see if Dr. Haigh would be a good fit at Beresford. Dr. Haigh and Plaintiff worked at the Beresford Clinic on different days. Plaintiff and other Beresford Clinic staff were upset with Dr. Haigh's

2

presence as it appeared to them that he was taking over the Beresford Clinic. Dr. Haigh changed the medications prescribed by Plaintiff when he treated patients previously treated by her and criticized her medical care within earshot of staff and patients. At the end of September or beginning of October Plaintiff found out that she was not listed as a physician at the Clinic Brochure that had not yet been printed. Plaintiff testified that she inquired of the Brandon Clinic manager why she was not on the brochure and told that it was a mistake. However, the alleged mistake was not corrected and the brochures were printed listing Dr. Haigh and not Dr. Benson as the physician at the Beresford Clinic. *See* Exhibit 2.

Plaintiff testified that in October or November of 2006 she met with Dr. Haigh and Dr. Haigh advised that he had been told by management that he needed to turn the big ship around. Dr. Haigh testified that the meeting with Dr. Benson occurred, but he did not specifically remember what was said. In November of 2006 Plaintiff and the nurse practitioner at the Beresford Clinic met with Tiefenthaler to advise that Dr. Haigh was not a good fit at the Beresford Clinic. Tiefenthaler told Plaintiff and the nurse practitioner that Dr. Haigh would be staying. Staff at the Beresford Clinic testified that they had not encountered any requests from patients for a male physician. Dr. Haigh testified that although he did not recall details, he was told that the reason he was going to the Beresford Clinic was because they needed a male as well as a female physician there.

Dr. Haigh, a Canadian citizen, came to work in South Dakota on a J1 Visa Waiver residency program for federally underserviced areas. After determining that the Viborg, South Dakota medical setting was not a good fit for him, Dr. Haigh signed a contract with Sanford in October of 2005 to work at the Canton, South Dakota Clinic. Dr. Haigh, not Dr. Benson, had hospital privileges at the Canton Hospital. No patient at the Beresford Clinic, however, had ever asked to be admitted to the Canton Hospital, but instead requested to be hospitalized in Sioux Falls. Dr. Benson used the services of a hospitalist with regard to the patients admitted at the Sanford Hospital. Noone from Sanford had ever requested that she seek admitting privileges at either the Canton or Sanford Sioux Falls Hospital. Dr. Haigh was the last physician to come to the Canton Clinic, had a lighter patient load than the other Canton Clinic physicians, and testimony was given that there were economic reasons to justify sending him to the Beresford Clinic.

In January of 2007 Plaintiff met with Dr. Blue, the President of Sanford, and expressed her

3

concerns about the issues with Dr. Haigh at the Beresford Clinic and advised Dr. Blue that Tiefenthaler had told her they needed a man at the Beresford Clinic. Plaintiff testified Dr. Blue advised her she may have misunderstood Thiefenthaler and that he would get back with her. Dr. Blue testified that the conversation occurred, and acknowledged that gender should not be a consideration and that the reported comment shocked him. However, Dr. Blue further testified that he did not view the conversation as a complaint about discrimination and that he did not believe he needed to get back to Dr. Benson. Dr. Blue testified that he spoke with Tiefenthaler about the comment. Tiefenthaler testified that Dr. Blue spoke to him about concerns with the Beresford Clinic but not about a sexual discrimination comment.

A couple weeks after Dr. Benson spoke with Dr. Blue, Tiefenthaler called Plaintiff at home and said that the nurse practitioner that she supervised would be leaving the Beresford Clinic in two weeks and at the time there was no plan as to a replacement. Plaintiff testified that this could have the ramifications of reducing her pay by the $1600 per month she was paid for supervising the nurse practitioner and that it could also increase her workload. Plaintiff then advised Tiefenthaler that she would not be returning to the Beresford Clinic. Tiefenthaler testified, contrary to Plaintiff's testimony, that it was in January, after Plaintiff quit at the Beresford Clinic, that he offered Plaintiff the Minute Clinic position. This position paid about half the salary Plaintiff made at the Beresford Clinic.

Plaintiff did not receive training in sexual discrimination from Sanford until 2008. Plaintiff did not register a complaint with Sanford's Chief Human Resource Officer, although it is not clear from the Sanford's organizational chart or any other evidence presented that submitting a complaint to Human Resources was the route that a physician with a discrimination complaint would be expected to take in the relevant time period.

After leaving the Beresford Clinic, Plaintiff continued to work for Sanford at an acute care clinic in Sioux Falls, South Dakota. Plaintiff filed her sex discrimination claim with the South Dakota Division of Human Rights in May of 2008. Tiefethaler was the vice president involved when contracts for the acute care clinic were being renegotiated at the end of 2008. Because Teifenthaler was brought back as the vice president over the acute care clinic where Plaintiff would be working, Plaintiff went to an unscheduled part-time status so as to work at other clinics and not be working

4

under Teifenthaler's supervision. Unscheduled part-time status work did not include benefits and Plaintiff was not allowed to work as many shifts as she had previously worked or wanted to work. One month Plaintiff offered to work 28 shifts but was only allowed to work four.

After going to an unscheduled part-time status, Plaintiff also requested to work at the Sanford Women's Clinic but was not offered employment there. Plaintiff then sought out employment outside of Sanford. Plaintiff, in consideration of her no-compete clause, requested approval from Sanford to take other Sioux Falls physician positions, but the positions were filled while Plaintiff waited for Sanford to respond.

**1.**
**WHETHER PLAINTIFF IS ENTITLED TO A NEW TRIAL ON HER TITLE VII CLAIM?**

Federal Rule of Civil Procedure 59 allows a court considering a motion made pursuant to the Rule, to grant a new trial to any party on all or some of the issues. A court may grant a new trial if a verdict is against the great weight of the evidence, so that granting a motion for new trial would prevent a miscarriage of justice. *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996). In considering a motion for new trial "the court is not simply to substitute its judgment for the jury's, granting a new trial whenever it would find differently than the jury has. "*Ryan by Ryan v. McDonough Power Equip., Inc.*, 734 F.2d 385, 387 (8th Cir. 1984).

Plaintiff maintains that the jury's verdict regarding Plaintiff's Title VII claim is against the weight of the evidence and that it would be a "miscarriage of justice" to the Plaintiff to allow the jury's verdict for the Defendant on the Title VII claim to stand. In support of her position Plaintiff focuses on direct evidence of gender discrimination with regard to her employment with Defendants while Plaintiff was employed at Sanford's Beresford Clinic.

Plaintiff's Title VII claim required her to prove constructive discharge. While Plaintiff's evidence of gender being a motivating factor in Defendant's conduct was substantial but not uncontroverted, Plaintiff also had the burden of establishing that her working conditions were made intolerable. *See* Instruction No. 13. To establish that her working conditions were made intolerable, Plaintiff was required to demonstrate that a reasonable person in her "situation would have deemed

5

resignation the only reasonable alternative." *See* Instruction No. 15; *see also Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.").

Plaintiff is a physician who was working only one day a week at the Beresford Clinic, and she was working under a contract of employment. Neither Tiefenthaler nor Dr. Haigh were physically present at the Beresford Clinic while Plaintiff worked there and although Plaintiff met with Dr. Haigh, she never requested that he stop the conduct she and the staff found upsetting. In addition, Tiefenthaler, who had only been a vice president at Sanford since 2005, did not have the authority to terminate Plaintiff's employment and did not have the power on his own to alter Plaintiff's contract. While the Court does not condone the response or lack thereof by Dr. Blue and Dr. Heineman to Plaintiff's report of Tiefenthaler's discriminatory comment, the Court can also understand that the jury may have concluded that Plaintiff could have made and followed through with a more direct and clear charge of gender discrimination before resigning from her position at the Beresford Clinic. In considering the evidence and the law regarding the adverse employment action of constructive discharge, the Court does not conclude that it must grant a new trial on the Title VII claim so as to prevent a miscarriage of justice. The motion for new trial is denied with respect to the Title VII claim.

**2.**

### WHETHER PLAINTIFF IS ENTITLED TO A NEW TRIAL ON HER NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM OR ON DAMAGES FOR THAT CLAIM?

When the jury returned its verdict, they stated on the verdict form that they found in favor of Plaintiff on Plaintiff's cause of action for negligent infliction of emotional distress, and also stated that they found damages in the amount of $0 for past emotional distress. Immediately after the verdict was received, this Court announced that it found the verdict regular on its face.

The Court's unstated reaction was more complicated than what the Court stated in open court. The finding for Defendants on the first cause of action, the Title VII, was maybe not a problem but the Court had to consider whether the two verdicts regarding liability were inconsistent. Then when looking at zero damages for that second cause of action, the Court thought that part of

6

the verdict might be a problem. Rather than trying on the spur of the moment to sort out the potential issues, or to say what was a potential problem or problems, the Court instead went ahead and followed the usual practice of accepting the verdicts. The Court's view was that some although not extensive damages were shown, but whether it was an inconsistent verdict as to that second cause of action was going to take some legal research and analysis as well as a review of the record. The Court expected at the time of accepting the verdicts that such legal research and analysis and evidence review would be forthcoming in a subsequent written Motion and Brief from the Plaintiff. The extent of damages shown by the evidence was modest but uncontested as to what was claimed as damages. There was, however, no admission as to causation of damages although causation was implicit but not strongly argued by either Plaintiff or Defendants. Given the posture of the case, if Plaintiff had immediately asked that the jury be directed to deliberate further on Count 2, the Court would certainly have requested argument on that request. The defense could have urged that the liability verdicts appeared to be inconsistent, and while resisting further deliberation, if further deliberation was to take place, that the liability verdict on the second cause of action should also be revisited. The Plaintiff could then rejoin that if further jury consideration was allowed, then the liability verdict on the first cause of action should also be revisited. Without any legal research or anything other than the Court's recollection of testimony and trial notes, the Court doubts that it would have directed the jury to deliberate further if such a request had been immediately made. The Court saw upon reading the verdicts that there was a possible issue as to the zero verdict and did not elect to sua sponte direct further deliberation. In addition, on the spur of the moment, the Court is unsure what issue or issues the Court would have directed the jury to revisit, if any. After briefing and research and reflection, the Court now knows that if requested, the jury should not have been directed to deliberate further.      Before the jury rendered its verdict, the Court received and responded to a note signed by two of the jurors which asked: "What would the 'suffered a physical manifestation of the distress' description be? An explanation of those words would be appreciated ." Doc. 199. The Court responded in Instruction 28:

> In your note of July 8, 2011, you asked:
>
> What would the "suffered a physical manifestation of the distress"

description be? An explanation of those words would be appreciated.

Response: A physical manifestation means physical symptoms and can include, for two examples, nausea and diarrhea. Depression alone is not a physical manifestation.

The Court then received another note signed by two jurors. The content of the later note and the Court's response is set forth as follows in Instruction No. 29:

In your note of July 8, 2011, you asked the following questions:

the Defendant's conduct was a legal cause of Plaintiffs emotional distress

1. -Do[ es] this mean all of her emotional distress?

Response: See Instruction No. 24 as well as all the other instructions concerning negligent infliction of emotional distress.

2. Just to clarify, do we need to name an amount of award for the second cause of action?

Response: If under the evidence and the court's instructions you are making an award for the second cause of action, then you do need to name an amount of award. If there is any concern regarding duplication of damages, that will be subsequently addressed by the Court.

3. Is there a minimum or maximum amount?

Response: There is no predetermined minimum or maximum amount you may award. The award has to be an amount warranted by the evidence and the law.

Doc. 202.

Plaintiff contends that a verdict awarding liability for the negligent infliction of emotional distress but awarding zero damages is against the weight of the evidence in this case and that a new trial is necessary to prevent a miscarriage of justice. Sanford contends that a plaintiff who believes a verdict is ambiguous or inconsistent must request that the matter be resubmitted to the jury before it is discharged, and that since Plaintiff failed to request re-submission of the inconsistent verdict to

8

the jury, she waived the right to contend that the verdict should be overturned as inconsistent.

> Federal Rule of Civil Procedure 49(b)(3) provides:
> When the answers [to written questions] are consistent with each other but one or more is inconsistent with the general verdict, the court may:
> (A) approve, for entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict;
> (B) direct the jury to further consider its answers and verdict; or
> (C) order a new trial.

A plaintiff may waive the right to a new trial by either failing to object to inconsistencies between verdicts and interrogatories or failing to move for re-submission of the inconsistent verdict. *See Brode v. Cohn*, 966 F.2d 1237, 1239 (8th Cir.1992). The purpose of the waiver rule is to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury, and to prevent a dissatisfied party from misusing procedural rules to obtain a new trial for an asserted inconsistent verdict. *Lockard v. Missouri Pac. R. Co.*, 894 F.2d 299, 304 (8th Cir.1990).

The waiver rule regarding inconsistent verdicts does not necessarily extend to any case in which zero damages are awarded. *See Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010). If the verdict is not internally inconsistent, there is no basis for re-submission to the jury and the usual procedures for overturning jury verdicts as inconsistent with the facts will suffice without the plaintiff objecting to the verdict before the jury is dismissed. *Id.* In addition, many of the cases that find a waiver of an inconsistency between a general verdict and special finding involve "varying degrees of warning given by the judge prior to his excusing of the jury." *See Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351, 1355 n.3 (9th Cir.1987); *see also Hundley v. District of Columbia*, 494 F.3d 1097, 1103 (C.A.D.C. 2007)(no waiver found when "[a]fter the jury delivered its verdict, the District Court dismissed the jury almost immediately. Consistent with ordinary practice, the District Court did not ask the parties whether they further "objected" in some way to that verdict.").

Even if this Court assumes that the zero damages verdict was internally inconsistent, under the circumstances of this case the Court does not find that Plaintiff waived her right to challenge the zero verdict as being inconsistent with the facts. Not only is it questionable whether Plaintiff had the opportunity to object to the verdict and request re-submission to the jury, it is further

questionable as to how useful re-submission would be in this particular case. The Court had instructed and then submitted supplemental instructions on the issue of damages for the negligent infliction of emotional distress claim, and it is unclear to the Court what further instruction it could have submitted to the jury on this issue. Supplemental Instruction 29 both in itself and by reference to the legal cause instruction, Instruction 24, made it clear that there could be a zero verdict on damages. As a result of those and the other instructions of the Court, the Court finds that in fact the zero verdict was not internally inconsistent with the liability verdict. *Cf. Henry v. Henry*, 605 N.W.2d 285, 289 (S.D. 2000)("a zero verdict is not necessarily fatal to [plaintiff's] case.").

Plaintiff provided uncontroverted testimony regarding her damages. Plaintiff testified that the treatment she received from Sanford caused her to be sick to her stomach, experience diarrhea, and experience heart racing. Plaintiff testified that her blood pressure rose around 30 points. In addition, Plaintiff testified that on some nights she could not sleep and was up on the hour and had to take sleep medication although no medication was named nor was any cost for such medication testified to. There was no documentary evidence regarding any damages. Dr. Ed Clark also testified to the sleep problems suffered by Plaintiff. Because of the sleep problems Plaintiff suffered "horrendous headaches." Plaintiff testified that she walked and took other measures to decrease the impact of the stress she was experiencing. Plaintiff further testified that to be methodically pushed out of a practice she loved and cared for was devastating emotionally.

Although it was implied, there was no expert opinion evidence of Defendants' actions or omissions on the intentional infliction claim being a legal cause of Plaintiff's physical problems. *Cf. Kusser v. Feller*, 453 N.W.2d 619, 622 (S.D. 1990)(verdict in favor of plaintiff with no award of damages upheld because jury may have concluded "damages were not established with reasonable certainty").

The zero damages award is against the weight of the evidence presented at this trial. The damages evidence was not strong but there was no contrary evidence. A jury's finding of liability without a corresponding award of damages under such circumstances, however, does not necessarily invalidate the verdict because the jury has the right to reject the evidence of damages as being speculative or unreasonable. *See Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*,391 F.3d 936, 945-946 (8th Cir.2004). Given the question of legal cause and the lack of strength of the damages

evidence, the Court does not view the zero damages verdict as a miscarriage of justice. The Court anticipated not a nominal but a modest damages verdict for the Plaintiff if there was a Plaintiff's verdict. That is not the test for granting a new trial. "[F]ixing damages is peculiarly a jury function, and its award will be sustained unless shown to indicate prejudice, mistake, or a complete disregard of law and evidence." *Wright v. Hoover*, 329 F.2d 72, 76 (8th Cir. 1964). The jury could well have viewed the Plaintiff as a principled person who stood up for what she believed was right and that the consequences are what principle sometimes gets us in this rough and tumble and still sometimes unfair world. By finding liability the jury could have been siding with the Plaintiff on her principles and telling Defendants, "Don't do it again." There was and is room within the law and the instructions for the jury to have reached those conclusions, among others, in this case. Accordingly,

 **IT IS ORDERED** that Plaintiff's Motion for New Trial, Doc. 212, is denied.

Dated this 16 day of December, 2011.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: *Colleen Schultz*
(SEAL)       DEPUTY

11